## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 12-20244-CR-UNGARO/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

ALEXIS BRACHE, SR.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

This matter is before the Court on Defendant's Motion to Suppress Evidence ("motion"). [D.E. 23]. The Court has reviewed the motion, the government's response [D.E. 26] and held an evidentiary hearing regarding this motion on May 30, 2012. At close of arguments, the Court directed the parties to file supplemental briefings on various issues raised during the hearing, which the Court has also reviewed. [D.E. 30, 31]. For the following reasons, Defendant's Motion should be **DENIED**.[1]

### *I.  BACKGROUND*

On April 10, 2012, Defendant Alex Brache, Sr., ("Defendant") was indicted for crimes relating to the importation and possession of illegal narcotics with the intent to distribute. [D.E. 10]. Defendant moves to suppress all of the physical evidence recovered from his residence as the result of an unlawful search and seizure in

_____

[1]    On May 24, 2012, Judge Ungaro referred this motion to the undersigned for disposition. [D.E. 25].

violation of the Fourth Amendment to the United States Constitution. Generally, Defendant contends the physical evidence should be suppressed because agents lacked probable cause to search his residence, lacked exigent circumstances for a warrantless search (notwithstanding the purported lack of probable cause), and obtained his consent to search the residence involuntarily. The government contends, however, that agents complied with all protections afforded Defendant under the Fourth Amendment. We rest our decision on the testimony and facts presented during the May 30, 3012 evidentiary hearing.

## II. BACKGROUND

On the morning of March 27, 2012, U.S. Customs and Border Protection Officers assigned to the DHL Miami International Airport Facility detected that a DHL parcel arriving from Honduras contained approximately 700 grams of cocaine, secreted inside the parcel's stereo equipment. Agents removed the narcotics and then repackaged the stereo equipment for a controlled delivery. The parcel's air bill listed Gustavo Garcia, at 6585 W. 24th Avenue, Apt. 39, Hialeah, Florida, as the intended recipient. The air bill included a contact telephone number too. (Tr. 5:15-8:2).

Based on database and computer checks, law-enforcement officers determined the listed address was nonexistent. Department of Homeland Security ("DHS") Special Agent Brian Luoma ("Agent Luoma"),[2] along with other agents, secured the narcotics

---

[2]     Agent Luoma is DHS's case agent who was assigned to this investigation. He provided the Court with the majority of the background facts relative to DHS's investigation, including both first hand knowledge and information he learned from other participating agents. The Court finds Agent Luoma credible in all respects.

and then released the parcel to DHL for its regularly scheduled delivery.   At approximately 1:45 p.m., DHS agents followed the DHL delivery van as it began its route.   They observed the driver near the address listed on the parcel's air bill and, shortly thereafter, observed him speaking on his cell phone.   At approximately 2:05 p.m., the DHL delivery van delivered the parcel to an individual, later identified as Yoelis Santos ("Santos"), located at 6358 N.W. 24th Ave., Apt. 39, Hialeah, Florida 33016. *Id.*

Minutes later, agents stopped and questioned the DHL driver.   He confirmed that the listed address did not exist, but that he received a corrected address from the individual who answered his phone call.   The driver further confirmed that he delivered the subject parcel to a "Gustavo Garcia" (i.e. Santos), the same individual who provided the corrected address.

Agents then observed Santos leave his apartment with the parcel and drive to a residence located at 1670 W. 62nd Street, Hialeah, Florida.   Upon arriving, agents observed Santos enter the residence, exit to retrieve the parcel from his car, and then re-enter the residence with the parcel in hand. (Tr. 8:8-9:13).

The agents maintained their positions and observed the residence with the parcel inside for an undisturbed period of approximately fifteen minutes. (Tr. 9:13-17). Thereafter, DHS Special Agent James Beagle ("Agent Beagle"), accompanied by two additional agents, knocked and announced their presence at the front door.   Nobody answered. (Tr. 10:12-15; 14:11-19).   While on the porch, agents neither heard nor observed anything unusual happening inside the residence (except, of course, for the

lack of a response at the door). (Tr. 10:17-24). Meanwhile, Miami-Dade Police Department Detective Andy Valdes ("Det. Valdes"), who stood to the side of the front door near a privacy fence, observed an individual (later identified as the Defendant) appear in the backyard of the subject residence and throw a box resembling the DHL parcel over a fence. (Tr. 85:20-86:7; 100:15-18; 117:23-118:23). This observation, which Det. Valdes relayed to Agent Beagle, heightened their level of concern and sense of urgency. In turn, this caused them to draw their weapons. (Tr. 36:1-37:7; 87:17-88:17). Det. Valdes then identified himself as "police" and directed Defendant to "freeze." (Tr. 85:22-86:5; 102:24-105:3). Instead of complying, Defendant turned and quickly returned to his residence. *Id.*

Agent Beagle – now with increased purpose – again knocked and announced their presence at the front door. After a few more minutes, Santos finally answered the door. (Tr. 87:17-25). Agent Beagle identified themselves as "Police Department" and told him they "need to come in and talk to you." (Tr. 37:10-38:25; 68:17-21). Santos "consented" to Agent Beagle's "request" (albeit couched in declaratory terms) to enter the residence. (Tr. 37:1-7). However, the agents and Santos only proceeded into the residence's foyer or entranceway. (Tr. 38:3-13). Defendant then exited his bedroom voluntarily and met agents in the foyer. They explained they were law enforcement and requested Defendant to exit his residence. (Tr. 38:14-39:16). With Santos and Defendant secured on the front lawn, agents conducted a brief protective sweep of the residence, which was limited to places a person could theoretically hide. (Tr. 39:21-41:25). The agents encountered two individuals, Defendant's son and his friend, but

4

found no narcotics or other incriminating evidence in plain view during this brief protective sweep. *Id*.; 89:24-90:2.[3]  After agents completed the sweep, they holstered their weapons and kept them holstered for the remainder of their investigation. (Tr. 88:1-13; 91:2-14).

Thereafter, Det. Valdes explained to Defendant that they were conducting an investigation and asked to speak with him inside his residence.  Defendant agreed and accompanied Det. Valdes and Agent Beagle inside. (Tr. 92:3-18).[4]  Det. Valdes presented Defendant with a Spanish-language *Miranda* waiver form.  He explained the form to Defendant who, in turn, acknowledged understanding its substance and executed the form.  (Tr. 93:3-12).  After speaking with Defendant for a short while (approximately five minutes), Det. Valdes handed him a consent to search form.  This form was in English, but Det. Valdes translated the form to Spanish and explained the substance of the consent to him. (Tr. 94:10 - 95:14; 112:13-113:1).  Defendant did not ask any questions about the consent form. (Tr. 115:4-17).  After denying any involvement with illegal narcotics, Defendant executed the consent form without

---

[3]     There was also a bedridden elderly gentleman inside the residence that officers left be. (Tr. 40:17-20).

[4]     Defendant is a Spanish speaker.  Because Det. Valdes was the only Spanish-speaking agent, all communications were translated through Det. Valdes. Defendant makes no claim that Det. Valdes improperly translated or otherwise used this language barrier to Defendant's disadvantage.  Therefore, we accept that any and all communications were accurately translate to and understood by Defendant in all respects.

hesitation. (Tr. 95:10-12; 97:6-7 ("[Defendant] had no problem with us searching his residence"); 111:7:9).

According to the agents' *uncontroverted* testimony, they presented Defendant with these forms while they sat in his residence at his dining room table.  He was not handcuffed.  The agents' firearms were holstered.  They made no threats or aggressive show of force, and they did not place any narcotics on the table to coerce his consent. Moreover, at all times, agents spoke with Defendant in a conversational, non-confrontational tone.  (Tr. 49:7-50:9; 91:6-14; 93:13-14; 124:6-13).

Approximately thirty to forty minutes later, agents – with the assistance of a narcotics canine – searched Defendant's residence.  This search uncovered narcotics and contraband hidden inside Defendant's bedroom. (Tr. 49:7-50:25). After agents recovered the narcotics, and Defendant learned of their discovery, he admitted the narcotics were his. (Tr. 126:5-127:17).  Defendant nevertheless denied any knowledge of the contents of the DHL parcel.  Thereafter, agents arrested him.

## III.   ANALYSIS

As alluded to above, Defendant raises several arguments to support his suppression motion.  First, while agents may have had probable cause to search and arrest Santos,[5] this probable cause did not extend to Defendant's residence.  Second, even if agents had probable cause to search Defendant's residence (which Defendant disputes), their search was improper because there were no exigent circumstances to

---

[5]    Defendant's counsel concedes that agents had probable cause to "stop" Santos. (Tr. 127:10-17).

permit a warrantless search.  Third, in his supplemental brief,  Defendant argues that agents procured his "voluntary" consent through, in effect, a show of force that overpowered any "free will" Defendant might have had to refuse their request for consent to search his residence.  As a consequence, Defendant asserts his "consent" cannot remedy the agents' earlier constitutional violations.  Based on these errors, Defendant maintains that all physical evidence recovered from his residence must be suppressed.  The government disagrees with Defendant and maintains that the agents acted in accordance with the law in all respects.

### A.   *Probable Cause to Search Defendant's Residence*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and further provides that "no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980) (citation omitted); *see also United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir. 1983) (citing *Payton*, 445 U.S. at 586).  "A warrantless search [of a home] is allowed, however, where both probable cause and exigent circumstances exist." *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc); *see also United States v. Santa*, 236 F.3d 662, 668-69 (11th Cir. 2000) (same).

A sufficient basis for "[p]robable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of

7

a crime will be found in a particular place." *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005) (internal quotation marks omitted) (quoting *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002)).  A "fair probability," in turn, exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime. *See United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (citing *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir.1988)).  The connection between the objects to be seized and the premises to be searched can be established "from the particular circumstances involved and need not rest on direct observation." *Id.* (quoting *United States v. Tate*, 586 F.3d 936, 943 (11th Cir. 2009)).

As a preliminary matter, agents had probable cause to believe that Santos committed a felony.  The agents intercepted a parcel containing narcotics with a corresponding air bill that contained a fictitious name and address.  However, through further investigation, agents learned the airbill contained Santos' true phone number and, ultimately, he directed and accepted delivery of the parcel at his actual residence.  Thus, at a minimum, there is no dispute that a reasonable agent, considering the totality of the circumstances, had probable cause to search and arrest Santos.  *See, e.g., Magluta*, 418 F.3d at 1182 (probable cause existed to stop Bonachea's car and search the box in her truck based on a reliable tip).  Indeed, with *Magluta* in mind, it logically follows that, even more so than a reliable tip, an agent's personal observations that Santos received a parcel ostensibly concealing drugs is also a sufficient basis to

establish probable cause. *See, e.g., United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002) (agent found probable cause to execute warrantless search of premises based on his personal observations); *see also United States v. Price*, No. 1:07-CR-290-JEC-RGV, 2008 WL 842418, at *4 (N.D. Ga. Mar. 28, 2008) (same in automobile context), *aff'd* 353 F. App'x 308 (11th Cir. 2009).  Moreover, as noted, Defendant effectively concedes this point during the evidentiary hearing. *See* n. 5, *infra*.  As such, we conclude that probable cause clearly existed with respect to Santos.

The relevant inquiry here, however, is whether this probable cause extended to Defendant's residence after agents observed Santos enter with the parcel.  We believe it does.  For starters, and as a general matter, to conclude otherwise would produce a counterintuitive and illogical result.  Indeed, there is no compelling reason why, solely based on an individual entering a home, an agent's reasonable belief based on the totality of the circumstances that contraband or evidence of a crime exists should extinguish simply because that individual crosses the threshold of a private residence. *See generally United States v. Santana*, 427 U.S. 38 (1976) (holding that a "suspect may not defeat an arrest which has been set in motion in a public place ... by the expedient escaping to a private place.").  And specifically, the Eleventh Circuit has previously heard and decided a factually similar probable cause inquiry in the affirmative. *See Burgos*, 720 F.2d 1520.

There, the court found there was probable cause to enter Burgos' home after agents observed a man purchase two crates of firearms from two gun shops and

transfer them to the trunk of Burgos' automobile. Burgos drove to his residence with the surveillance team following him. Together with another man, he then took the crates out of his trunk and into his house. *Id.* at 1525-26. *Burgos* concluded that "[t]hese collective facts would lead a reasonably cautious person to believe that the search [of Burgos' residence] would uncover evidence of a crime. *Id.* at 1525; *see also Tobin*, 923 F.2d 1506, 1508, 1510 (concluding probable cause existed to search a residence for cocaine after agents made three salient observations: 1) a vehicle parked in front of the subject residence; 2) Tobin (an individual then unknown to agents) exited that vehicle, knocked on the front door and was granted access; 3) Ackerson (another individual unknown to agents) raised the garage door permitting Tobin to exit and retrieve three clear plastic tubular bags (believed to contain cocaine) from the vehicle and then quickly return to the garage).

Thus, relying on *Burgos* and *Tobin*, we conclude that agents had the requisite probable cause to search Defendant's residence after observing Santos pick up, transport and then enter Defendant's residence with a parcel that – to the best of Santos' knowledge (and reasonably imputed to Defendant) – contained approximately 700 grams of cocaine.

### B.    *Exigent Circumstances Permitted a Warrantless Search*

Having already determined that agents had probable cause to search the residence, we turn to whether exigent circumstances permitted their warrantless search. It is now well established that agents, armed with probable cause, may conduct a warrantless search of a private residence when the exigencies of a situation

make obtaining a search warrant from a magistrate judge impractical. *See, e.g.,* *Burgos*; *Tobin*; *see also Holloway*, 290 F.3d at 1334 ("The [exigent circumstances] exception encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable ... .").

Although "[c]ourts have catalogued several situations in which exigent circumstances exist, ... it is clear that the exception must be applied carefully to each factual scenario." *United States v. Lynch,* 934 F.2d 1226, 1232 (11th Cir. 1991) (citing *United States v. Blasco,* 702 F.2d 1315, 1325 (11th Cir. 1983)). "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it ... .' " *Chimel v. California,* 395 U.S. 752, 762 (1969) (alterations and omissions in original) (quoting *United States v. Jeffers,* 342 U.S. 48, 51 (1951)). The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *Burgos,* 720 F.2d at 1526. Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." *Blasco,* 702 F.2d at 1325.

This circuit has recognized that "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." *Tobin,* 923 F.2d at 1510 (quoting *United*

*States v. Young,* 909 F.2d 442, 446 (11th Cir.1990)). "The mere presence of contraband, however, does not give rise to exigent circumstances." *Lynch,* 934 F.2d at 1232. "The test of whether exigent circumstances exist is an objective one. '[T]he appropriate inquiry is whether the facts ... would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.' " *Tobin,* 923 F.2d at 1510 (quoting *United States v. Rivera,* 825 F.2d 152, 156 (7th Cir.1987)).

Here, the relevant facts are: agents investigating an illegal narcotics lead arrive at Defendant's residence and observe Santos enter that residence with a parcel ostensibly containing cocaine; agents wait approximately 15 minutes then conduct a knock and announce; after waiting an additional period of minutes, Det. Valdes observes Defendant in the backyard throw the DHL parcel over his fence, ignore Det. Valdes' commends and then quickly return to his residence; agents then knock and announce again until Santos finally answers the door and agents conduct a protective sweep.

With those facts in mind, and in context with an unknown and quickly changing narcotics investigation, we conclude that an exigency arose *after* (but not before) Det. Valdes observed Defendant toss the DHL parcel over the fence and then quickly return to his residence *in spite of* Det. Valdes's commends of "police" and to "stop." Indeed, as *Tobin* (and many other cases) unequivocally make clear, narcotics cases present a special situation where, as a matter of fact, the material evidence can be quickly destroyed after a suspect is tipped off to police presence and, thus, an exigency arises

in such a situation. *See United States v. Reid*, 69 F.3d 1109, 1113 (11th Cir. 1995); *Tobin*; *Young*.

Here, admittedly, the fact that agents waited and conducted a prolonged knock and announce tends to diminish the government's exigency argument. *See, e.g., G.M. Leasing Corp. v. United States*, 429 U.S. 338, 358-59 (1977) (concluding generally that an extended delay in conducting a search may extinguish the exigency and render the warrantless search invalid); *see also McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007) (exigent circumstances were deemed extinguished because many hours had passed between the initial contact and the arrest). However, Defendant's subsequent decision to exit his residence, throw the DHL parcel over the fence, ignore Det. Valdes commends and then quickly return to his home provided the agents with sufficient (if not new) objective facts that would lead a reasonable agent to conclude that evidence might be destroyed if he waited to obtain a warrant. *See United States v. Rodgers*, 924 F.2d 219, 222-23 (11th Cir. 1991) (reversing the district court and holding that the presence or absence of exigent circumstances must be examined *as the circumstances arise*). Indeed, *Rodgers* disagreed with the weight the district court placed on the fact that the agents were not initially acting as if there were exigent circumstances and reasoned that this conduct should not preclude a subsequent emergence of exigent circumstances once new objective facts arose to support such a conclusion. *Id.* at 222-23.[6] Similarly, and despite the brief delay in commencing the search, we conclude that

---

[6]     And, to the extent agents waited for Santos to open the door and grant their admittance – as opposed to barging in –  we fail to see how their overly cautious

the circumstances arising after Defendant threw the parcel over the fence and returned to his residence provided agents with sufficient objective facts to determine that exigent circumstances permitted their warrantless entry into Defendant's residence.[7]

Thereafter, agents conducted a brief protective sweep of the residence, limited to places where a person could hide, that lasted no more than two or three minutes. The agents testified that the purpose of the protective sweep was to ensure that there were no individuals hiding within the residence who could pose a security threat to them. Defendant does not object to either the length or scope of the search, but maintains that it was improper because agents lacked probable cause and exigent circumstances – two objections previously dispelled herein.

---

behavior (notwithstanding both probable cause and exigent circumstances) should transform their less-intrusive methods into constitutional violations.

[7]    During the hearing, Defendant argues in part that agents improperly created the exigent circumstance. *See United States v. Santa*, 236 F.3d 662, 669-671 (court held that officers cannot avoid obtaining a search warrant by creating exigent circumstances). To summarize his argument, Defendant contends that (instead of what transpired here) should have stopped Santos before he arrived at Defendant's residence and, while Defendant was unaware of the police activity, obtained a warrant and then executed it on Defendant's property. However, in *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011), the Supreme Court held that the exigent circumstances exception to the search warrant requirement applies even if the law enforcement agents "created" the exigency, unless the agents created the exigency by engaging or threatening to engage in conduct that violated the Fourth Amendment. Here, the exigency arose while agents conducted an investigatory knock and announce, which clearly is permissible under the Fourth Amendment. *See Tobin*, 923 F.2d at 1511 (agent may knock on the door of a residence to ask the occupants questions); *see also United States v. Carroll*, 144 F. App'x 3, 4 (11th Cir. 2008) (finding officer who first approached front door of residence could proceed to back door because sign on the front door directed visitors to do so). Not to mention, there is no way to know whether or not Santos called Defendant on his way to his residence. Had he done so, and then not arrived, this consequently would have tipped Defendant off.

Short of concluding that the protective sweep was permissible, we note the cautionary language of *United States v. Noreiga*, 676 F.3d 1252, 1260 (11th Cir. 2012) ("The legality of the protective sweep is a difficult question.  It requires balancing two deeply important interests – the lives of law enforcement officers and the constitutional right of the people to be secure in their homes under the Fourth Amendment.") (citing *United States v. Delancy*, 502 F.3d 1297, 1307 (11th Cir. 2007)) and conclude instead that this issue is moot because the protective sweep did not result in the recovery of any evidence.  Hence, even if it was improper (which we doubt it was), there is no evidence to suppress.[8]

### C.    *Did Defendant Give Voluntary Consent to Search?*

After agents conducted a protective sweep of Defendant's residence and removed the occupants from the home, Defendant returned to his residence with the agents and, after executing a Miranda form, provided written consent to search his residence.  The consent form reads in full:

> I, Alexis Brache, have been requested by Officer/Agent Beagle and A. Valdes of the MDPD/ICE to permit a thorough search of the following area: 1670 W 62[nd] St Hialeah FL, 33012.  I have been advised of my right to refuse consent; I give this permission voluntarily; and I authorize the above

---

[8]    Traditionally, a protective sweep is permitted pursuant to an in-house arrest of a suspect where the officer "possess a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 331 (1990).  In *Leggette*, this circuit acknowledged the expansion of this doctrine to sweeps beyond in-house arrests to other situations where officers are lawfully present in a home. *United States v. Leggette*, 260 F. App'x 247, 249-250 (11th Cir. 2008).

named Officer/Agent(s) to take any items determined to be
related to their investigation.[9]

[D.E. 28-1].  Det. Valdes translated this English form to Spanish and explained the
entire form to Defendant who, after not making any objections, executed the form.
Nevertheless, Defendant contends that his consent was involuntary based on agents'
show of force.  Also, to a lesser degree, Defendant contends that his consent did not
contemplate the use of a narcotics canine and, thus, the agents' violated the scope of
his consent.

    With respect to the agents' show of force, Defendant tends to raise a *Delancy*
issue.  In *Delancy*, the Eleventh Circuit held that courts are "required to conduct two
separate inquires where a consent to search follows prior illegal activity by the police
officer."  *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007).[10]  "First, a
court must determine whether consent was voluntary.  Second, the court must
determine whether the consent, even if voluntary, requires exclusion of the evidence
during the search because it was the 'fruit of the poisonous tree' – the product of an
illegal entry." *Id.* (citation omitted).  This two step approach is mandatory, and the
government bears the burden on both issues. *Id.*

    Defendant's consent was voluntary.   Indeed, the government presents
uncontroverted evidence by Agents Beagle, Luomo and Det. Valdes – each of which the

_____

[9]    Defendant's consent form is signed and dated the day of the search.

[10]   While we deem the protective sweep issue moot, and on a cursory basis
conclude it was valid, for the consent issue we will presume the protective sweep
unlawful.

Court finds credible –  that Defendant's written consent was given voluntarily.  The agents spoke in a conversational tone, their weapons were holstered, Defendant was not handcuffed, and the agents never threatened or coerced him.  Defendant presents no evidence to the contrary.  As such, we conclude the consent was voluntary and turn to the second inquiry. *See, e.g., Delancy*, 502 F.3d at 1305; *see also United States v. Sanders*, 315 F. App'x 819, 823-24 (11th Cir. 2009) (finding, under similar facts, that consent was given knowingly and voluntarily).

This second issue, as framed by *Delancy*, is: "[w]hether the illegal entry tainted [Defendant's] consent so that the evidence found *after* the consent should be excluded." *Id.* at 1309. (emphasis in original).  The inquiry is fact-specific, and three factors are especially helpful in resolving the question: "1) the temporal proximity of the seizure and the consent, 2) the presence of intervening circumstances, and, particularly, 3) the purpose and flagrancy of the official misconduct." *Santa*, 236 F.3d at 677.

The first factor – temporal proximity – relates to the time elapsed between the putatively illegal protective sweep and when Defendant consented to the search.  The undisputed facts here are the agents conducted a 2-3 minute protective sweep, brought Defendant back into the residence and then received consent to search the residence approximately 5-10 minutes later.  This issue exists on a sliding scale: a short time weighs in favor of exclusion, while a long time weighs against exclusion. *Compare Santa*, 236 F.3d at 666-67, 678 (observing that there had been no "significant lapse in time" in a case where the defendant, handcuffed and lying on the floor, consented to

a search just two to three minutes after police made an illegal forced entry into his home); *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (observing that a period of three minutes is an "extremely close temporal proximity") *with Devier v. Zant*, 3 F.3d 1445, 1459 (11th Cir. 1993) (per curiam) ("Under these circumstances, we must conclude that any taint from his detention on December 2 had been completely attenuated by the time of his eventual confession four days later."); *Delancy*, 502 F.3d at 1310-11 (concluding that a period of 10 to 20 minutes between the illegal entry and consent, while a short lapse in time, when viewed through the totality of the circumstances, was far less offensive than *Santa*).

Using those cases as a metric, we find the temporal proximity was short and, as such, would typically weigh in favor of exclusion.  However, like *Delancy*, we must also acknowledge that the facts are strikingly dissimilar from *Santa* because agents did not kick in the door, handcuff the defendant or demand his consent while he was restrained laying face down on the ground.  Rather, after they entered the residence, Defendant exited from his bedroom and joined the agents in his foyer.  Defendant then exited the residence while agents conducted the protective sweep.  Only after they finished, did Defendant return to his residence and converse with the agents in a conversational tone on his dining room table and then, ultimately execute the form.  As such, and notwithstanding the short lapse in time, we conclude that, at most, this issue is neutral and weighs in favor of neither party.

The second factor relates to whether an intervening circumstance or event interrupts the casual connection between the putatively illegal protective sweep and Defendant's consent. *Delancy*, 502 F.3d at 1311. Here, a well-recognized intervening circumstance occurred: Defendant executed a written consent form. As outlined above, the form unequivocally advised Defendant of his right to refuse consent, but he granted permission anyway.[11] For the reasons succinctly outlined in *Delancy*, 502 F.3d at 1311-12, we too find that this written consent form "supports the government's argument that the causal connection between the entry and the consent had 'become so attenuated as to dissipate the taint.'" *Id.* at 1312 (citations omitted).

Finally, the third factor relates to whether the purpose and flagrancy of the official conduct demonstrates that the illegal search was pretextual and designed solely to obtain consent to perform a more thorough search. *Id.* Here, the facts fail to support any colorable argument that the agents' protective sweep was simply a means to obtaining Defendant's consent.

With respect to the agents' purpose, the record is undisputed that they conducted a protective sweep to ensure their safety. It is well-recognized in this circuit that firearms are a tool of the illegal narcotics trade – indeed Defendant's counsel stipulated as much during the hearing.[12] *See, e.g., United States v. Pham*, 463 F.3d

---

[11]    Notably, agents are under no obligation to inform a homeowner of their right to refuse consent. *See United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004).

[12]    (Tr. 12:9-16).

1239, 1246 (11th Cir. 2006) (guns are a tool of the drug trade); *United States v. Terzado-Madruga*, 897 F.2d 1099, 1120 (11th Cir. 1990) (same). Thus, the testimony of agents that their purpose for conducting a brief, protective sweep of this residence to determine if there were any additional (potentially armed) individuals hiding within is entirely consonant with our protective sweep jurisprudence. *See, e.g., United States v. Victores*, No. 10-20716-CR, 2011 WL 3424449, at *5 (S.D. Fla. Aug. 5, 2011) (purpose and breadth of brief protective sweep for the purpose of safety in narcotics investigation context deemed permissible).

What remains is flagrancy. Specifically, did the agents act so flagrantly or with such a show of force to render Defendant unable to freely deny agents' request for his consent to search? We find on these facts they did not. Indeed, agents did not break down the door; Santos opened it. Agents did not drag Defendant out of his room or to the front yard; rather, he independently exited his bedroom, met agents at the foyer and then accompanied them outside. Agents never handcuffed or restrained Defendant, made threats, or pointed their weapons at Defendant; rather, he sat with them at his dining room table and spoke with agents in a conversational tone until he executed the consent form. Simply put, the actions undertaken by agents in procuring Defendant's consent were not so overbearing, aggressive or constitutionally offensive so as to rise to the level in which this Court would be convinced that Defendant was unable to exercise his free will to deny their request to search his residence. In other words, the record is devoid of any material evidence to suggest that agents performed

their duties in a flagrant fashion while inside Defendant's residence that could warrant our exclusion of the recovered evidence.

Moreover, to the extent Defendant suggests his consent was procured after evidence was already recovered and presented to him, Det. Valdes and Agent Luomo's testimony belies such a factual finding. Rather, they both clearly testified that there was no evidence presented to Defendant until *after* he gave consent and agents conducted the search. Hence, there is no credible suggestion that the agents exploited evidence to obtain Defendant's consent. Thus, when considered together, the facts clearly establish that the agents' conduct was neither for an improper purpose nor flagrant. Therefore, this factor also weighs in the government's favor and supports a conclusion that the taint (to the extent one exists) is too attenuated to warrant exclusion of evidence. *See Delancy*, 502 F.3d at 1312 (holding that officers who enter a home out of "genuine and legitimate concern for their safety, their actions, even if unlawful, [are] not [flagrant]"); *see also Victores*, 2011 WL 3424449, at *5 (holding the agents' actions lacked flagrancy based on their calm interaction with defendant and the absence of drawn weapons or restraints upon anybody inside the home); *but see United States v. Barsoum*, No. 8:11-cr-548-T-33MAP, 2012 WL 1405699, at *4 (M.D. Fla. Apr. 5, 2012) (concluding actions were flagrant where agent "admitted he wanted to secure [d]efendant's consent to search his house and chose that location for the [d]efendant's arrest to increase his odds that he could search the residence").

On balance, the three factors, viewed in context with the totality of the circumstances, weigh in the government's favor. Accordingly, we conclude that the

taint, if any, associated with the putative illegal protective sweep (assuming it was indeed unlawful) and while close in time to Defendant's consent, was sufficiently remedied by the process of acquiring Defendant's consent and minimized by the agents' conduct before and during the acquisition of Defendant's consent. *See Delancy*, 502 F.3d at 1313-14.[13]

Finally, even if we thought this case presented a close call (which we conclude it does not), the Eleventh Circuit has clearly solidified Defendant's fate in its recent

---

[13]     As a secondary argument, Defendant contends that the search went beyond the scope of his consent because agents used a narcotics canine.  Generally, a search is impermissible when an officer does not conform to the limitations imposed by the person giving consent. *United States v. Zapata,* 180 F.3d 1237, 1242 (11th Cir. 1999) (citing *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir.1990)); *see also United States v. Martinez,* 949 F.2d 1117, 1119 (11th Cir.1992) (holding that consensual search is confined to the terms of actual consent given). When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search "is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *Strickland,* 902 F.2d at 941; *see also Florida v. Jimeno,* 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent ... is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). To ascertain what conduct is within the "bounds of reasonableness," the Court must consider what the parties knew to be the object (or objects) of the search. *See Jimeno,* 500 U.S. at 251; *Martinez,* 949 F.2d at 1119. Here, in light of the fact that Defendant knew the agents were searching for illegal narcotics and that his consent extended (without limitation) to his entire residence, it is not outside the "bounds of reasonableness" that his consent to search for narcotics would extend to permitting a narcotics canine to assist in the search. *See United States v. Duncan*, 356 F. App'x 250, 253 (11th Cir. 2009) (consent to search residence for drugs, when officers told suspect they would use narcotics dog, did not violate scope of consent); *see also United States v. Woods*, 445 F. Supp. 2d 1328, 1332-33 (M.D. Ala. 2006) (general consent to search vehicle included use of narcotics canine).  Here, although Defendant was not expressly told that his consent would extend to a narcotics canine, once the canine arrived Defendant could have, but did not, refuse to extend his consent to the canine search. As such, the Court finds Defendant's argument as to the scope of the search unavailing and rejects same.

published opinion: *United States v. Welch*, No. 10-14649, 2012 WL 2122163 (11th Cir. June 13, 2012).

In *Welch*, officers searched for Jacobs – an individual suspected of armed robbery – who was potentially residing in three different apartments. Without any arrest or search warrants, three groups of officers knocked and announced at the three apartments, simultaneously, hoping to find Jacobs. An individual, not Jacobs, opened one of the apartment doors and acknowledged that somebody was present but would not say who. Officers entered the apartment and conducted a "protective sweep," during which they found Welch, smoking a joint and tending to a baby. They moved Welch to the balcony and then learned on the radio that Jacobs was found elsewhere, but not his gun. Officers asked for Welch's consent to search for Jacobs' gun. He refused initially, but after an officer noted that they will get a warrant and it "would take a while" he consented to the search. The time between entry and consent was short, a matter of minutes. The search uncovered a pistol and ammunition that belonged to Welch, not Jacobs. Welch, a convicted felony, was charged with felon in possession. *Id.* at *1-2.

*Welch* concluded that the defendant's consent was voluntary because the temporal lapse was short (similar to this case), oral and written consent was given (similar to this case), because the officers' "illegal search" had the justified purpose of protection (similar to this case) and the officers did not act flagrantly (again, similar to this case). But, unlike this case, the defendant actually refused consent and changed his mind only *after* officers made comments to the effect that if he refused they would

23

simply obtain a warrant and that (allegedly) they would call Department of Child Services if he refused consent. *Id.* at *4. With these additional "hiccups" – arguably coercions or threats – *Welch* presented a situation that raised greater constitutional concerns than this case, but nevertheless *Welch* affirmed the lower court's order denying defendant's suppression motion. Accordingly, with *Welch* in mind, and with the full support of *Delancy,* we find that Defendant's consent was voluntary and the taint, if any, is too attenuated to warrant exclusion of the evidence recovered from the search.

## IV. CONCLUSION

The agents' investigation and approach to searching and detaining Defendant was, for lack of a better word, muddled. However, we find that the agents' actions never raised to a level that otherwise infringed on the protections afforded this Defendant pursuant to the Fourth Amendment of the United States Constitution. Accordingly, Defendant's Motion to Suppress Physical Evidence should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have until **June 25, 2012** to serve and file written objections, if any, with the Honorable Ursula Ungaro, United States District Judge. The Court finds good cause to expedite the objection period in light of the imminent trial date. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte*

*v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 19th day of June, 2012.

*/s/ Edwin G. Torres*

EDWIN G. TORRES
United States Magistrate Judge